No. 26-5393

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JASON LAIBLE, *et al.*,

*Plaintiffs-Appellees*

v.

TIMOTHY LANTER, *et al.*,

*Defendants-Appellants*

On appeal from the United States District Court
for the Eastern District of Kentucky
Civil Case No. 2:21-cv-00102
The Honorable David L. Bunning, U.S. District Judge

**APPELLANTS' PRINCIPAL BRIEF**

Aaron M. Herzig
Spencer S. Cowan
Taft Stettinius & Hollister LLP
301 E. Fourth Street, Suite 2800
Cincinnati, OH  45202
Phone: (513) 381-2838
aherzig@taftlaw.com
scowan@taftlaw.com

*Counsel for Defendants-Appellants*
*Timothy Lanter, Brett Thomas, and City of Cincinnati*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26 and Sixth Circuit

Rule 26.1, Defendants-Appellants Timothy Lanter, Brett Thomas, and the

City of Cincinnati make these disclosures:

1. Are any parties a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   No.

Dated: July 29, 2026

*/s/ Aaron M. Herzig*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ....................................................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................... viii

JURISDICTIONAL STATEMENT ............................................................. 1

ISSUES PRESENTED FOR REVIEW ......................................................... 2

STATEMENT OF THE CASE .................................................................... 3

I.    Introduction ....................................................................................... 3

II.   Factual Background .......................................................................... 6

      A.    The ATF Task Force targets Mason Meyer. ............................... 6

      B.    Meyer's criminal history is extensive. ....................................... 7

      C.    After an unsuccessful traffic stop, the ATF Task Force develops
            an operational plan to apprehend Meyer. .................................. 8

      D.    The ATF Task Force executes the Plan. ................................... 10

      E.    The ATF Task Force moves to Price Hill to surveil Meyer. ...... 11

      F.    The ATF Task Force identifies Meyer and attempts to stop him.
            .............................................................................................. 12

      G.    Meyer flees, and a pursuit begins. .......................................... 14

      H.    Meyer crosses into Kentucky. ................................................. 15

      I.    Meyer pleads guilty to a host of crimes, including murdering the
            Laibles. .................................................................................. 17

J.      CPD investigates the pursuit. ...................................................... 19

III.    Procedural History ..................................................................... 22

SUMMARY OF THE ARGUMENT ................................................... 24

ARGUMENT ................................................................................... 27

I.      Ohio law, not Kentucky law, governs the Officers' immunity claim.  27

      A.      Immunity is a distinct issue that requires its own choice-of-law analysis. .......................................................................... 28

      B.      Under principles of comity, Kentucky would apply Ohio immunity law. ...................................................................... 29

      C.      Ohio's interests are overwhelming. ......................................... 30

II.     Under Ohio law, the Officers are entitled to state qualified immunity. ................................................................................... 32

      A.      The Officers did not act with malicious purpose or in bad faith. ................................................................................... 34

      B.      The Officers did not act in a wanton manner. ......................... 35

      C.      The Officers did not act in a reckless manner. ........................ 36

            1.      Meyer's danger justified the Officers' pursuit decisions. 38

            2.      The Officers exercised care throughout the pursuit. ...... 38

            3.      The Officers' policy infractions do not establish recklessness. ................................................................. 40

III.    Under Kentucky law, the Officers are entitled to qualified immunity. ................................................................................... 41

      A.      The decision whether to terminate a pursuit is a discretionary act. ................................................................................... 42

iii

1. The district court misread the operative pursuit policy. 44

2. Kentucky treats pursuit policies like CPD's policy as imposing discretionary duties on officers. ...................... 46

    a. *Meinhart* and *Browning* treat balancing-type pursuit policies as discretionary. .......................... 46

    b. *Sheehy* does not control. ....................................... 49

3. None of the conditions that require pursuit termination applied. ........................................................................... 52

B. Plaintiffs cannot rebut the presumption that the Officers acted in good faith. ............................................................................ 56

IV. The City of Cincinnati is entitled to summary judgment because the Officers are immune. ............................................................................ 58

CONCLUSION ............................................................................................. 59

CERTIFICATE OF COMPLIANCE ................................................................ 60

CERTIFICATE OF SERVICE ........................................................................ 61

DESIGNATION OF RELEVANT DISTRICT COURT RECORD ................. 62

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of Massillon,*
983 N.E.2d 266 (Ohio 2012) ........................................................... 35, 36, 40

*Anderson v. City of Westlake,*
182 N.E.3d 1225 (Ohio Ct. App. 2021) ................................................ 34, 37

*Andujar v. Hub Grp. Trucking, Inc.,*
161 F.4th 1014 (6th Cir. 2025) ............................................................ 27

*Argabrite v. Neer,*
75 N.E. 3d 161 (Ohio 2016) ...................................................... 33, 36, 37, 38

*Browder v. Fentress,*
No. 2013-CA-002178, 2018 WL 3202975 (Ky. Ct. App. June 29, 2018) ..... 45

*Browning v. Edmonson County,*
18 F.4th 516 (6th Cir. 2021) ....................................................... 46, 48, 49

*Clements v. Brimfield Twp. Police Dep't,*
92 N.E.3d 37 (Ohio Ct. App. 2017) .......................................................... 34

*Comer v. Risko,*
833 N.E.2d 712 (Ohio 2005) ................................................................. 58

*DeVooght v. City of Warren,*
157 F.4th 893 (6th Cir. 2025) ............................................................ 27

*Est. of Marr v. City of Glasgow,*
No. 25–5662, 2026 WL 735026 (6th Cir. Mar. 16, 2026) .......................... 58

*Fabrey v. McDonald Vill. Police Dep't,*
639 N.E.2d 31 (Ohio 1994) ................................................................... 36

*Haney v. Monsky,*
311 S.W. 3d 235 (Ky. 2010) ................................................................. 43

*Harris Corp. v. Comair, Inc.,*
712 F.2d 1069 (6th Cir. 1983) .............................................................. 28

*Haugh v. City of Louisville,*
242 S.W.3d 683 (Ky. Ct. App. 2007)..................................................................58

*Laible v. Lanter,*
91 F.4th 438 (6th Cir. 2024) ...................................................................1, 23

*Matkovich v. Penn Cent. Transp. Co.,*
431 N.E.2d 652 (Ohio 1982)................................................................. 35

*Meinhart v. Louisville Metro Gov't,*
627 S.W.3d 824 (Ky. 2021) ...................................................................passim

*Menuskin v. Williams,*
145 F.3d 755 (6th Cir. 1998)................................................................28

*Meyers v. City of Cincinnati,*
979 F.2d 1154 (6th Cir. 1992) ...............................................................32

*O'Toole v. Denihan,*
889 N.E.2d 505 (Ohio 2008) ................................................................36

*Pittman v. Rutherford,*
No. 19–36–DLB–CJS, 2020 WL 6386489 (E.D. Ky. July 7, 2020),
*adopted by* 2020 WL 6384726 (E.D. Ky. Oct. 30, 2020) ...............28, 29, 30

*Saleba v. Schrand,*
300 S.W.3d 177 (Ky. 2009) ...................................................................28

*Sheehy v. Volentine,*
706 S.W.3d 229 (Ky. 2024)....................................................... 42, 43, 49, 50

*State v. Great Lakes Minerals,*
597 S.W.3d 169 (Ky. 2019) ................................................................29, 30

*Strock v. Pressnell,*
527 N.E.2d 1235 (Ohio 1988) ..............................................................58

*Tighe v. Diamond,*
80 N.E. 2d 122 (Ohio 1948)..................................................................35

*United States v. Green,*
532 F.3d 538 (6th Cir. 2008) ................................................................38

*United States v. Thomas,*
No. 23-1706, 2024 WL 1672371 (6th Cir. Apr. 18, 2024)............................38

*Upchurch v. Clinton Cnty.,*
330 S.W. 2d 428 (Ky. 1959) ........................................................................43

*Williams v. Cincinnati,*
No. C-210146, 2021 WL 4978711 (Ohio Ct. App. Oct. 27, 2021) .................32

*Yanero v. Davis,*
65 S.W.3d 510 (Ky. 2001).................................................................... 43, 56

**Statutes**
28 U.S.C. § 1291........................................................................................... 1

28 U.S.C. § 1442 .......................................................................................1, 22

28 U.S.C. § 2679 .......................................................................................... 22

Ohio Admin. Code § 109:2-18-02................................................................30

Ohio Rev. Code § 109.803 ...........................................................................30

Ohio Rev. Code § 2744.03 ...................................................................... 32, 33

**Rules**
Fed. R. Civ. P. 56 ........................................................................................ 27

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellants Lieutenant Timothy Lanter and Officer Brett Thomas (collectively, the "Officers") and the City of Cincinnati (together with the Officers, "Defendants") request oral argument.

This appeal presents a significant question about qualified immunity law: whether the Officers' decision to continue their vehicle pursuit of a violent felon—informed by their evaluation of many real-time factors—was an act of discretion for which they are entitled to immunity.

This appeal also raises an unsettled choice-of-law question: which State's immunity law governs a police pursuit that began in Ohio, was conducted by City of Cincinnati police officers who were trained under Ohio law, and is governed by City of Cincinnati policies that were framed by Ohio law. Oral argument will help clarify these issues and the extensive record before this Court.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1442(a)(1), which conferred federal-officer removal jurisdiction. *Laible v. Lanter*, 91 F.4th 438, 441 (6th Cir. 2024).

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the Officers appeal the denial of qualified immunity and their appeal turns on an issue of law.

This Court also has appellate jurisdiction to review the City of Cincinnati's appeal because the claim against it is inextricably intertwined with the claims against the Officers. If the Officers are entitled to qualified immunity under Kentucky or Ohio law, then the City cannot be liable under a vicarious liability theory.

# ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in applying Kentucky immunity law, rather than Ohio immunity law, to determine whether the Officers—trained and supervised under Ohio law, employed by an Ohio municipality, and governed by a policy created under Ohio law—are immune from suit.

2.      Whether the Officers are entitled to state qualified immunity (a) under Ohio law, where the record does not establish that they acted with malicious purpose, in bad faith, or in a wanton or reckless manner; or (b) under Kentucky law, where the record confirms that they exercised a discretionary function to continue their pursuit of a violent felon.

3.      Whether the City of Cincinnati is entitled to summary judgment on Plaintiffs' vicarious liability claims, which fail as a matter of law if the Officers are immune.

**STATEMENT OF THE CASE**

## I.    Introduction

This appeal is about the district court's improper denial of qualified immunity to two Cincinnati Police Department officers—Lieutenant Timothy Lanter and Officer Brett Thomas. But it begins and ends with Mason Meyer, a dangerous felon who was a leader of an interstate drug-and-gun trafficking organization, carried warrants for violent crimes, and had evaded law enforcement. Meyer used violence against his customers, associates, and the public as part of his criminal enterprise. He told associates that he was terminally ill and would rather die in a shootout with police than return to prison.

So in the summer of 2020, a joint task force comprising ATF agents, Kentucky drug-enforcement officers, and Cincinnati police officers (the "ATF Task Force") tracked Meyer and developed a plan to take him into custody. On the morning of August 7, 2020, the ATF Task Force surveilled a residence Meyer frequented—preferring, if possible, to apprehend him on foot or to disable his vehicle for the safety of nearby residents and law enforcement. The ATF Task Force planned a traffic stop as a fallback. Meyer emerged from the residence, placing a rifle case in his car. When he drove off, the ATF Task Force moved to execute that plan.

Meyer evaded apprehension and fled, leading law enforcement on a pursuit through Cincinnati, across the Ohio River, and into Kentucky. The Officers who pursued Meyer never touched his car or even came particularly close to it. They activated their lights and sirens, slowed at intersections, exercised care for the drivers around them, and followed at a distance. But the pursuit ended in Newport, Kentucky—tragically—where Meyer swerved into an outdoor restaurant. Meyer killed Gayle and Raymond Laible and injured Maribeth and Steven Klein. He pleaded guilty to the Laibles' murders and is serving a life sentence. He was separately sentenced to 300 months in federal prison for the trafficking operation.

Plaintiffs—Meyer's victims—sued Meyer. But they also seek to hold the Officers and the City liable for crimes that Meyer alone committed. Defendants moved for summary judgment on the ground that they are immune under Ohio or Kentucky law, but the district court denied that motion. Three key reasons warrant reversal.

*First*, the district court applied the wrong body of law. The Officers are Ohio employees, trained and supervised under Ohio law and bound by a pursuit policy adopted under Ohio law. Kentucky's own choice-of-law rules direct that Ohio immunity law governs their immunity—yet the district

court applied Kentucky law because Meyer's flight happened to end on the Kentucky side of the Ohio River.

*Second*, the Officers are immune under Ohio law, which shields officers from liability absent wanton or reckless conduct that the danger of a high-speed pursuit alone cannot establish.

And if Kentucky law applies, they are also immune: the decision whether to continue a pursuit is a discretionary judgment. The district court held otherwise—only by misreading CPD's policy. It deemed the Officers' decision to *initiate* the pursuit discretionary but their decision not to *terminate* that same pursuit ministerial. Those two conclusions are incompatible.

*Third*, the vicarious liability claim against the City of Cincinnati rises or falls with the Officers' immunity. The only claims still pending against the City seek to hold it vicariously liable for the Officers' conduct, but vicarious liability requires an underlying tort by the employee. Because the Officers are immune, there is no predicate liability, and the City is entitled to judgment as a matter of law.

The consequences of the district court's decision reach beyond this case. Immunity exists so that officers can do their jobs—including apprehending dangerous criminals—without the prospect of personal

liability distorting the split-second judgments their jobs demand. Indeed, Kentucky's and Ohio's immunity doctrines reflect a shared premise: that an officer need not watch idly while an armed felon flees and that the inherent danger of a pursuit alone cannot be turned into a jury question about the officer's liability.

But the district court's ruling inverts that premise. It tells officers that their immunity does not necessarily turn on the law of the State that trains and employs them. And it signals that pursuing a violent, fleeing suspect—even when the circumstances warrant it—may expose them to personal liability. Officers cannot be asked to police under a rule like that, which neither Ohio nor Kentucky imposes.

Because the Officers are immune under Ohio or Kentucky law—and because the City cannot be vicariously liable if the Officers are immune—this Court should reverse the district court with direction to enter judgment for Defendants.

## II. Factual Background

### A. The ATF Task Force targets Mason Meyer.

In the summer of 2020, the ATF Task Force was working to apprehend wanted criminals in greater Cincinnati. Its primary goal was to investigate federal firearms offenses and to execute federal and state

warrants against individuals just like Meyer. Indeed, Meyer had outstanding warrants for first-degree wanton endangerment, first-degree fleeing and evading from police, and a misdemeanor warrant for a probation violation. (R. 58–1, ATF Operational Plan at PageID 442–45.) He also was a leader of an interstate criminal network that trafficked firearms and sold large quantities of methamphetamine. (*Id.* at PageID 443.) This was a sophisticated organization, too: in 2020, it was using drones to help deliver drugs—something local ATF leadership had never seen before. (R. 136, Occhipinti Dep., 96:25–97:17, PageID 2001–02.)

### B. Meyer's criminal history is extensive.

Meyer was dangerous. He acted violently toward his subordinates, those who bought his drugs, and the public. Sources told law enforcement that Meyer had several subordinates selling methamphetamine on his behalf, whom Meyer would assault or kidnap if they did not remit their sales proceeds. (R. 58–1, ATF Operational Plan at PageID 443.) And Meyer even surveilled the mother of a man who owed him money—and told the man about the surveillance as a threat. (R. 135, Lanter Dep., 236:3–6, PageID 1587.)

The ATF also learned that Meyer pistol-whipped a victim in July 2020, causing the firearm to discharge, and that he boasted of murdering

another man. (R. 58–1, ATF Operational Plan at PageID 443.) Several weeks later, Meyer discharged a gun outside a Newport, Kentucky, home and then forced several guests to hide the gun for him. (*Id.*) That same day, law enforcement searched the home and found a loaded pistol, a handgun, and a rifle, along with 62 grams of methamphetamine. (*Id.*)

Meyer not only had access to firearms; he planned to use them— including against law enforcement. Sources told law enforcement that Meyer stated he was terminally ill with an inoperable brain tumor and thus had little concern for his life. (R. 10–1, Ex. A, Critical Incident Review at PageID 113, 118.) Those same sources claimed that Meyer was suicidal, repeatedly threatened to kill police officers, and stated a desire to die in a police shootout, rather than return to jail. (*Id.* at PageID 118.)

### C. After an unsuccessful traffic stop, the ATF Task Force develops an operational plan to apprehend Meyer.

CPD officers and members of another federal law enforcement task force based in northern Kentucky ("NKYDSF") were trying to locate Meyer on July 31, 2020, and spotted him driving an SUV. (R. 58–1, ATF Operational Plan at PageID 443.) The officers initiated a traffic stop, lost track of the SUV, and then located it soon after. (*Id.*) But when they finally stopped the SUV, Meyer was not inside. Working with members of his criminal enterprise, Meyer had swapped cars while law enforcement lost

sight of the SUV. (*Id.*; *see also* R. 135, Lanter Dep., 222:2–8 at PageID 1573.) Meyer evaded arrest.

About a week later, the ATF Task Force developed an operational plan ("ATF Operational Plan") that detailed how to apprehend Meyer. (R. 58–1, ATF Operational Plan at PageID 442–43.) ATF anticipated that its agents "may be riding in vehicles utilized by CPD to affect a stop and will assist with interviews, searches, and security during a vehicle stop." (*Id.* at PageID 445.) The ATF Operational Plan also explained that if ATF agents positively identified Meyer, "CPD uniform vehicles will be advised and directed to conduct a traffic stop following CPD policy, [and] ATF will assist as needed." (*Id.*)

The ATF anticipated that Meyer might flee, so it authorized ATF Task Force members to pursue "under extraordinary circumstances," including, but not limited to, "the threat of serious bodily injury or death to an agent or other party." (*Id.* at PageID 448.) The ATF Operational Plan also called for CPD K-9 units to assist with any felony traffic stop—especially if Meyer fled on foot. (*Id.* at PageID 445; *see also* R. 135, Lanter Dep., 193:15–21 at PageID 1544.)

**D. The ATF Task Force executes the Plan.**

On the morning of August 7, 2020, ATF Task Force members and CPD officers held a briefing to discuss the Meyer investigation and their plan to apprehend him that day. (R. 10–1, Ex. A, Critical Incident Review at PageID 113.)

Lieutenant Lanter—among the law enforcement officers in attendance—understood the danger that Meyer posed. He explained: "by the 7th we knew everything" about Meyer—including that he was a violent criminal. (R. 135, Lanter Dep., 223:24–25; 224:8–15 at PageID 1574–75.) In fact, Lieutenant Lanter donned a "heavy-plated vest[ ]" designed to "stop an AR round or a higher caliber-type round plate." (*Id.*, 189:5–7 at PageID 1540.) He had "been a cop for 19 years," but August 7, 2020, was "the only day that [he'd] put that vest on." (*Id.*, 189:7–9 at PageID 1540.)

When the briefing ended, some ATF Task Force members travelled to a home on De Votie Avenue in Cincinnati's Clifton neighborhood, where the ATF Task Force believed Meyer was located. (R. 135, Lanter Dep., 250:20–22 at PageID 1601.) Meyer was not there, having deceived law enforcement again. The ATF Task Force had been tracking the location of a cellphone that they believed belonged to Meyer. But Meyer "went through multiple phones," and that morning, the phone law enforcement thought he was

10

using was not sending "pings." (*Id.*, 199:21–200:5; 240:19–241:3 at PageID 1550–51; 1591–92.)

### E. The ATF Task Force moves to Price Hill to surveil Meyer.

Later that afternoon, the ATF Task Force began receiving pings from a phone showing that Meyer was near 721 Steiner Avenue in Cincinnati's Price Hill neighborhood. (*Id.*, 250:20–24 at PageID 1601.) So the ATF Task Force moved its operation to that location. (R. 138, Scalf Dep., 128:7–15 at PageID 2311; R. 135, Lanter Dep., 250:20–24 at PageID 1601.)

The ATF Task Force arrived heavily armed. Its members had to prepare for Meyer to use violence to avoid arrest or to take other dangerous steps like barricading himself and others in the residence. (R. 136, Occhipinti Dep., 117:25–118:4 at PageID 2022–23.) ATF Resident-Agent-in-Charge Frank Occhipinti ("RAC Occhipinti"), the on-scene commander, brought his duty firearm (a Glock 19), a Colt M4 carbine semiautomatic rifle, and about 60 rounds of ammunition. (*Id.*, 118:13–119:14 at PageID 2023–24.)

Ten ATF Task Force members brought firearms, including six with semi-automatic rifles. (*Id.*, 119:19–25 at PageID 2024; R. 58–1, ATF Operational Plan at Page ID 446.) They also brought breaching equipment to break down doors—including a Halligan and bunkers—ballistic shields,

11

and tasers. (R. 58–1, ATF Operational Plan at Page ID 446.) And because the ATF Task Force was prepared for violence, a Task Force member brought a medical kit, and the ATF Operational Plan identified the nearest trauma center and a telephone number for a life-flight helicopter. (*Id.*, 120:1–121:4; 131:17–132:7 at PageID 2025–26; 2036.)

Meanwhile, Officer Thomas and his K-9 reported for duty around 1:00 p.m. (R. 141, Thomas Dep., 166:9–13 at PageID 3079.) Soon after his shift began, Officer Thomas responded to a request for a K-9 unit to assist with the surveillance and apprehension of Meyer. (*Id.*, 166:18–167:21 at PageID 3079–80.) Officer Thomas learned that Meyer was wanted for a felony offense and had "claimed that he was not gonna go down without a shootout with the police." (*Id.*, 168:24; 169:15 at PageID 3081–82.) He then drove his police cruiser to a staging location near a Speedway gas station on River Road and awaited further instruction. (*Id.*, 173:2–9; 187:8–25 at PageID 3086; 3100.)

### F. The ATF Task Force identifies Meyer and attempts to stop him.

Back at 721 Steiner Avenue, ATF Task Force members made a positive identification of Meyer and his girlfriend, Kirsten Johnson. (R. 135, Lanter Dep., 257:7–15 at PageID 1608.) Around 3:00 p.m., Meyer exited the residence, carrying a firearm case. (R. 10–1, Ex. A, Critical Incident

Review at PageID 113.) He walked across the street, displaying the case's contents to several individuals. (*Id.*) Meyer then placed the firearm case on the rear seat of a black Ford Focus parked in a driveway. (*Id.* at PageID 114–15.)

The vehicle backed out of the driveway and pulled away, but the surveilling Task Force members' views were partially obstructed. Task Force members (including CPD personnel) could not be sufficiently certain that Meyer was in the vehicle. (*Id.* at PageID 114; *see also* R. 138, Scalf Dep., 129:12–21 at PageID 2312.) So they let the vehicle drive away, rather than block it in on Steiner Avenue.

They then executed the next step of the ATF Operational Plan: a traffic stop once the vehicle traveled away from Steiner Avenue and Meyer was identified in the vehicle. (R. 138, Scalf Dep., 129:18–21 at PageID 2312; R. 135, Lanter Dep., 259:12–14 at PageID 1610.) CPD Officer Mark Bode trailed the Ford Focus as it drove away from Steiner Avenue, but he was driving in an unmarked car and therefore could not initiate the traffic stop. (R. 134, Bode Dep., 94:20–24; 135:1–3 at PageID 1076; 1117.)[1] Lieutenant

---

[1] Under CPD policy, "[o]fficers wearing plainclothes or using unmarked vehicles will avoid making stops of suspected vehicles and will not engage in vehicle pursuits." (R. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1265.)

Lanter was staged away from Steiner Avenue, waiting in his marked police cruiser in a parking lot. (R. 135, Lanter Dep., 110:15–24 at PageID 1461.) When the Ford Focus passed Lieutenant Lanter, Officer Bode pulled aside, allowing Lieutenant Lanter to initiate a traffic stop. (R. 134, Bode Dep., 191:1–13 at PageID 1173.)

### G. Meyer flees, and a pursuit begins.

When Lieutenant Lanter activated his lights and sirens, Meyer refused to pull over as required by law, and it became apparent that he was not going to stop immediately. (R. 135, Lanter Dep., 94:9–95:23 at PageID 1445–46.) Lieutenant Lanter continued to follow Meyer, first on some secondary streets in Price Hill. (R. 10–1, Ex. A, Critical Incident Review, PageID 128.)

Meyer did not stop, so the traffic stop turned into a pursuit. Sergeant Scalf then announced himself as the officer in charge ("OIC") of the pursuit. (R. 138, Scalf Dep., 140:5–14 at PageID 2323.) Officer Thomas advised that he would be the secondary pursuit vehicle—following Lieutenant Lanter as the primary vehicle. (R. 10–1, Ex. A, Critical Incident Review at PageID 128.)

As the pursuit continued, RAC Occhipinti monitored the pings from Meyer's phone and—based on those pings—radioed the Officers to let them

14

know Meyer's location. (*Id.* at PageID 127.) Meyer continued onto the Sixth Street Viaduct, approaching downtown Cincinnati. (*Id.*) As Meyer drove south toward the Ohio River, Sergeant Scalf authorized the pursuit to continue into Kentucky. (R. 141, Thomas Dep., 235:8–11 at PageID 3148.) Around that same time, RAC Occhipinti "came over" the air and "repeated two communications ... on several occasions, to ensure that [the Officers] were aware that the suspect was wanted for felony and he was armed." (*Id.*, 228:1–14 at PageID 3141.) RAC Occhipinti also broadcast that the pursuit was proceeding toward Kentucky and instructed CPD dispatch to alert local law enforcement in Kentucky that the pursuit was incoming, which they did. (R. 136, Occhipinti Dep., 157:20–158:24 at PageID 2062–63.)

### H.  Meyer crosses into Kentucky.

Meyer crossed the Ohio River into Covington, Kentucky, and then into Newport. As Lieutenant Lanter explained, the pursuit was characterized by "turns to accelerate a burst to where you're approaching intersections, you're slowing down and then you're speeding up again and then you're slowing down, then you're speeding up again." (R. 135, Lanter Dep., 100:2–8 at PageID 1451.) Thomas, who maintained about 30 to 40 yards behind Lanter for much of the pursuit, corroborated that testimony, noting that the "speeds were not high" because "it was – it was a lot of

turns. It was short bursts of acceleration." (R. 141, Thomas Dep., 215:3–11; 216:11–14; 227:15–17 at PageID 3128–29; 3140.)

Meyer engaged in some evasive maneuvers to try to break the Officers' visual contact. (*Id.*, 217:6–12 at PageID 3130.) But Lanter, who was trailing Meyer, never saw a vehicle swerve to avoid colliding with Meyer. (R. 135, Lanter Dep., 108:14–19 at PageID 1459.) Meyer even continued to use his turn signals and slowed at various points to make turns. (*Id.*, 166:11–15 at PageID 1517). Before Meyer's collision, Lanter never observed "conditions in [the] pursuit that rose to the level of" requiring termination. (*Id.*, 166:16–18 at PageID 1517.) No CPD vehicle ever came in contact with Meyer's car.

Lieutenant Lanter drove several car-lengths from Meyer as the pursuit continued into Newport. (*See generally* R. 133, Notice of Filing of Videos, Lanter Recording.) The pursuit ended when Meyer lost control of his vehicle and swerved into the outdoor-dining area of a Newport restaurant, killing Raymond and Gayle Laible and injuring Steven and Maribeth Klein. (R. 10–1, Ex. A, Critical Incident Review at PageID 122.) Officers approached the Ford Focus and immediately apprehended Meyer, who appeared to be having "some kind of medical emergency." (R. 141, Thomas Dep., 238:21 at PageID 3151.)

16

**I.    Meyer pleads guilty to a host of crimes, including murdering the Laibles.**

Since his apprehension, Meyer pleaded guilty to seven criminal counts related to his attempted escape from law enforcement:

(1)    Murder[2]
(2)    Murder
(3)    Wanton Endangerment, First Degree
(4)    Wanton Endangerment, First Degree
(5)    Fleeing or Evading Police, First Degree, Motor Vehicle
(6)    Criminal Mischief, First Degree
(7)    Persistent Felony Offender, First Degree.

(R. 143–2, Signed Plea Offer, PageID 3326.)

Meyer's signed plea offer states:

Mason Meyer was fleeing from police during a high speed chase. The Defendant knowingly disregarded the obvious risk that his dangerous driving at extremely high speeds without regard for traffic laws through densely populated areas could result in death or serious physical injury to others. The Defendant lost control of his vehicle at the intersection of Monmouth Street and 5th Street and crashed into Press on Monmouth, a business located on the corner of that intersection. Two individuals who were dining at a patio table on the sidewalk outside Press were killed as a result of the crash. Two more individuals, pedestrians walking the sidewalk, were nearly struck by the Defendant's vehicle as it careened out

---

[2] Meyer's indictment highlights the relationship between his flight from police, the collision, and the murder charges: "Defendant committed the offense of MURDER, a felony, when he while operating a motor vehicle under circumstances manifesting extreme indifference to the value of human life, wantonly engaged in conduct that created a grave risk of death to another person and thereby caused the death of" Gayle and Raymond Laible. (R. 143–1, Meyer Indictment, PageID 3322–23.)

of control. As a result of the near-death experience, the pedestrians sustained injuries that required medical treatment.

(*Id.*)

The United States also indicted Meyer for possessing methamphetamine with the intent to distribute, possessing firearms in furtherance of a drug trafficking crime, narcotics conspiracy, possessing firearms in furtherance of a drug trafficking offense, and possessing firearms and ammunition as a known felon. (*United States v. Meyer*, 1:20-cr-00085 (S.D. Ohio July 14, 2021), ECF No. 163, Second Superseding Indictment.) Meyer pleaded guilty to these charges, and District Court Judge Jeffery Hopkins sentenced Meyer to 300 months in prison. (*Id.*, ECF No. 517, Sentencing Tr. at PageID 2918, 2950.)

Meyer's federal sentence calculation included an enhancement for the second-degree murder of the Laibles and for reckless endangerment for the injuries he caused to the Kleins. (*Id.* at PageID 2924–26, 2929–31). Meyer also received an enhancement for his leadership role in the criminal organization. (*Id.* at PageID 2928–29, 2931 (Meyer's "leadership within the firearm-related aspect of the offense ... was an essential part of the drug trafficking conduct[.]").)

**J.     CPD investigates the pursuit.**

The circumstances of Meyer's collision were tragic, and CPD and the Officers took it seriously. CPD's Internal Investigation Section ("IIS") completed an administrative review of the pursuit and issued a report on its findings (the "IIS Report"). (*See generally* R. 10–1, Ex. A, Critical Incident Review.) IIS scrutinized the Officers' conduct during the pursuit, measured against the operative CPD policies. The Officers cooperated fully.

CPD's pursuit policy involves a "weighing" of subjective factors, including the degree of risk to the public and the nature of the suspected crime. (*See generally* Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1263–75.) It states:

> During the emergency operation of police vehicles, and prior to and during a pursuit, officers must weigh the following factors:

| | |
|---|---|
| • Degree of risk created by pursuit to others, officer, and suspect. | • Condition of police vehicle and suspect's vehicle. |
| • Location where pursuit will take place. | • Any circumstance that could lead to a situation in which the pursuing officer(s) will not be able to maintain control of the police vehicle. |
| • Weather | |
| • Volume, type, speed, and direction of vehicular traffic and direction of pursuit | |
| • Nature/seriousness of suspected crime. | • Type of vehicle being pursued. |

| | |
|---|---|
| • Likelihood of successful apprehension. | • Whether the identity of the suspect is known to the point that later apprehension is possible. |

(Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1264–65.)

The pursuit policy also identifies circumstances when an officer must terminate a pursuit:

> Officers will terminate pursuits under any of the following conditions:
>
> a.  The pursuit OIC or the primary unit determines the level of danger created by the pursuit outweighs the necessity for immediate apprehension.
>
> b.  Establishment of the suspect's identity allowing for apprehension at a later time and there is no longer a need for immediate apprehension.
>
> c.  Location of the pursued vehicle is no longer known.
>
> d.  The pursued misdemeanor violator crosses the Hamilton County line (Refer to Section F.3.)

(Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1269.)

IIS did not find that the Officers violated any CPD policy related to initiating or terminating the pursuit. (*See generally* R. 10–1, Ex. A, Critical Incident Review.) According to the IIS Report, the Officers "slowed as they approached stop signs and red lights and exercised due regard for safety when they entered each intersection at a speed which afforded drivers a

reasonable opportunity to avoid a traffic crash," and "activated their emergency lights and siren, wore their seatbelt, and activated their [Body Worn Cameras]," all in compliance with CPD pursuit policy. (*Id.* at PageID 129.)

IIS found a few procedural violations. First, it concluded that Lieutenant Lanter violated Rules 1.03 and 12.535 by authorizing Officer Thomas to drive the wrong way on a one-way street. (*Id.*) Under CPD policy, only Sergeant Scalf—the pursuit OIC—could authorize that conduct.[3] (*Id.*) Second, IIS concluded that the Officers violated Rules 1.01 and 12.535(B)(3)(b) by exceeding the posted speed limit in excess of twenty miles per hour *while on the Sixth Street Viaduct in Cincinnati*—miles away from Meyer's crash in Newport, Kentucky. (*Id.* at PageID 129–32.) Indeed, Officer Thomas—who was not present at Steiner Avenue—was simply trying to catch up to the pursuit from another location. (R. 141, Thomas Dep., 215:12–22.)

---

[3] The IIS Report noted that Sergeant Scalf "attempted several times to confirm approval of the action but was unable to transmit because Officer Thomas was providing updated pursuit location and direction of travel." (R. 10–1, Ex. A, Critical Incident Review at PageID 119.)  Sergeant Scalf testified that he was frustrated by his inability to give authorization via radio, given the cross-traffic on the radio. (R. 138, Scalf Dep., 145:19–146:8 at PageID 2328–29.)

Per IIS's recommendation, Officer Thomas received written counseling, and Lieutenant Lanter received a written reprimand. (*Id.*, 267:13–268:10 at PageID 3180–81; R. 135, Lanter Dep., 301:22–302:7 at PageID 1652–53.) Both Officers were retrained on the City's related policies. (R. 141, Thomas Dep., 268:11–269:2 at PageID 3181–82; R. 135, Lanter Dep., 316:12–317 at PageID 1667.)

### III. Procedural History

Plaintiffs sued in Campbell County Circuit Court on August 4, 2021, asserting personal injury and wrongful death claims against Lanter, Thomas, Scalf, and the City of Cincinnati, among others. (R. 1-1, Compl., ¶¶ 138–54, PageID 33–35.) Because the Officers were part of a federal law enforcement task force, Defendants removed the case to the United States District Court for the Eastern District of Kentucky under the federal-officer removal statute, 28 U.S.C. § 1442. (R. 1, Not. of Removal, PageID 1.)

The case's early history centered on whether it belonged in federal court. Plaintiffs moved to remand, and Defendants Scalf, Lanter, and Thomas petitioned for certification under the Westfall Act, 28 U.S.C. § 2679. (R. 34, Pet. For Westfall Act Cert., PageID 245.) The district court denied the motion to remand—holding that Scalf was a federal officer

acting under color of federal office—but denied Westfall certification to all three officers. (R. 64, Mem. Op. & Order, PageID 464.)

Defendants appealed the Westfall ruling, and this Court affirmed in part and reversed in part. *Laible v. Lanter*, 91 F.4th 438 (6th Cir. 2024). This Court held that Scalf was entitled to Westfall immunity and substituted the United States in his place, but it affirmed the denial of certification as to Lanter and Thomas. *Id.* at 445–46. On remand, the United States moved to dismiss the claims against it, and Plaintiffs moved to drop the United States as a party. (R. 96, Mot. to Dismiss; R. 98, Mot. to Drop.) The district court granted the motion to drop, and retained subject-matter jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(a). (R. 103, Mem. Order, PageID 855–57.)

After discovery, Lanter and Thomas moved for summary judgment because they are immune under Ohio or Kentucky law. (R. 143, Lanter & Thomas's Mot. for Summ. J.) The City of Cincinnati separately moved for summary judgment on Plaintiffs' vicarious liability and negligent training claims. (R. 144, City of Cincinnati's Mot. for Summ. J.)

On April 2, 2026, the district court denied the Officers' motion and granted the City's motion in part and denied it in part. (R. 159, Mem. Op. & Order.) The district court applied Kentucky immunity law, reasoning that

23

Plaintiffs are Kentucky residents injured in Kentucky. (*Id.* at PageID 4322–23.) It then denied the Officers summary judgment on the personal injury and wrongful death claims, and it denied the City summary judgment on those same claims under a vicarious liability theory. (*Id.* at PageID 4335–37.) The court granted the City summary judgment on the negligent-training claim, and that ruling is not at issue here. (*Id.* at PageID 4337.) This appeal followed.

## SUMMARY OF THE ARGUMENT

The Court's analysis begins with a threshold choice-of-law question to determine the standard against which the Officers' conduct is measured. The district court applied Kentucky immunity law because Plaintiffs are Kentuckians and were injured in Kentucky. But that reasoning answers a question the Officers do not contest—*i.e.*, which State supplies the substantive law for Plaintiffs' personal injury and wrongful death claims. It does not resolve the immunity question. Kentucky decides choice of law issue by issue, and on the immunity issue, Kentucky would look to Ohio for the operative immunity law.

Kentucky's deference to Ohio is a matter of comity—but it also reflects Ohio's overriding interest in the immunity analysis. To determine whether the Officers are immune, the Court must interpret a policy adopted under

Ohio law and scrutinize whether the Officers—employed by an Ohio municipality; trained under Ohio law—complied with that policy. Ohio's interest in those questions is overwhelming; Kentucky has no comparable stake.

Under Ohio law, the Officers are immune. Ohio shields officers who are acting within the scope of their employment from liability absent malicious purpose, bad faith, or wanton or reckless conduct—an onerous standard. The Officers pursued an armed, violent felon as part of a planned operation. They activated their lights and sirens, slowed at intersections, never made contact with Meyer's vehicle, and identified nothing during the pursuit that required its termination. The two technical infractions that CPD identified do not establish the conscious disregard of a near-certain risk that Ohio law demands.

The result is the same under Kentucky law. Kentucky extends qualified immunity to the good-faith performance of discretionary acts. The decision whether to continue or terminate a pursuit is a textbook example of a discretionary act. Applying Kentucky law, the district court held that the Officers' decision to *initiate* the pursuit was discretionary and made in good faith. But it then held that their decision not to *terminate* that same pursuit—governed by the same policy and requiring the same weighing of

the same factors—was ministerial. Those two conclusions are irreconcilable.

CPD's policy directs officers to weigh the risks of pursuit against the consequences of a suspect's escape. That is exactly the kind of significant, independent professional judgment that Kentucky treats as discretionary, as both the Kentucky Supreme Court and this Court have held.

Finally, the vicarious liability claim against the City of Cincinnati rises and falls with the Officers' immunity. Plaintiffs premise their vicarious liability claim against the City on their underlying tort claims against the Officers for personal injury and wrongful death. Because the Officers are immune from liability on Plaintiffs' wrongful death and personal injury claims, there is no underlying liability, and the City is entitled to judgment as a matter of law.

For these reasons, this Court should reverse the denial of qualified immunity.

## ARGUMENT

This Court reviews the district court's summary judgment decision de novo. *Mitchell*, 176 F.4th at 489. That standard applies to all issues on appeal. *See Andujar v. Hub Grp. Trucking, Inc.*, 161 F.4th 1014, 1017 (6th Cir. 2025) (The Court reviews "the district court's answer to a choice-of-law question de novo."); *DeVooght v. City of Warren*, 157 F.4th 893, 898 (6th Cir. 2025) ("We review the denial of qualified immunity at summary judgment de novo."). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I. Ohio law, not Kentucky law, governs the Officers' immunity claim.

The choice between Ohio and Kentucky immunity law is the threshold issue on appeal because it determines the standard against which the Officers' conduct is measured. The district court applied Kentucky immunity law, reasoning that Kentucky has significant contacts with this case and that Kentucky courts strongly prefer their own law. But while that reasoning supplies the substantive law for Plaintiffs' claims, it does not answer which State's immunity law governs the Officers' immunity defense.

Immunity is a distinct issue that requires its own choice-of-law inquiry. And on that inquiry, Kentucky courts would apply Ohio law—both

because comity favors deference to the State whose employees and policies are at stake and because Ohio's interests here are overwhelming.

### A. Immunity is a distinct issue that requires its own choice-of-law analysis.

A federal court exercising supplemental jurisdiction must "apply the law of the forum state, including its choice of law rules." *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998). This Court therefore considers Kentucky's choice-of-law rules to determine whether Kentucky or Ohio immunity law applies.

To be sure, Kentucky's choice-of-law rules favor applying Kentucky's substantive law to resolve Plaintiffs' claims. *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983). But Kentucky decides choice of law issue by issue. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). That Kentucky law governs Plaintiffs' substantive claims does not resolve which State's law governs the Officers' immunity defenses. *See Pittman v. Rutherford*, No. 19–36–DLB–CJS, 2020 WL 6386489, at *3 (E.D. Ky. July 7, 2020), *adopted by* 2020 WL 6384726 (E.D. Ky. Oct. 30, 2020) ("The question is which state's law Kentucky would apply after considering the specific legal dispute at issue, here immunity.").

The district court, however, did not undertake that issue-specific inquiry. It reasoned that Kentucky law should apply across the board

because Plaintiffs were Kentuckians, injured in Kentucky. (*See* R. 159, Mem. Op. & Order at PageID 4323.) But that reasoning proves only that Kentucky law should govern Plaintiffs' personal injury and wrongful death claims—a point that Defendants do not dispute. It does not answer which State's law governs the Officers' immunity defense.

**B.     Under principles of comity, Kentucky would apply Ohio immunity law.**

No decision from the Kentucky Supreme Court provides a bright-line rule for which State's immunity law governs in a case with an interstate dimension like this case. *See Pittman*, 2020 WL 6386489, at *3. But recent "caselaw from the Kentucky Supreme Court suggests that Kentucky would defer to Ohio's immunity law on comity grounds." *Id.*

In *State v. Great Lakes Minerals,* the Kentucky Supreme Court recognized that Ohio law would determine the individual immunity of Ohio's tax commissioner, notwithstanding the lawsuit's substantial connection to Kentucky. 597 S.W.3d 169, 170 (Ky. 2019). The lawsuit challenged a commercial activity tax that Ohio imposed on a Kentucky business, which had no physical presence in Ohio, delivered no products to Ohio, and processed all transactions in Kentucky. *Id.* at 170. Even with those Kentucky-centered facts, the court acknowledged that the tax commissioner's immunity derived from the "state's common law immunity

29

doctrine" and that resolving his immunity "would ultimately turn on Ohio law." *Id.* at 173. Invoking comity, the court declined to substitute Kentucky's immunity law for Ohio law and dismissed the individual-capacity claim against the tax commissioner. *Id.* at 174.

Kentucky's deference to another State's immunity law is not confined to tax disputes. Applying *Great Lakes*, the Eastern District of Kentucky concluded that Kentucky would "defer to Ohio's immunity analysis rather than apply its own" in a case involving Kentucky plaintiffs, state law tort claims, and an Ohio county agency asserting an immunity defense. *Pittman*, 2020 WL 6386489, at *4. That same comity rationale applies here. Whether the Officers are immune turns on CPD's pursuit policy—adopted under Ohio law—and on the standards Ohio sets for the officers it trains. Ohio law therefore should answer that analysis.

### C. Ohio's interests are overwhelming.

Comity aside, Ohio's interests in this dispute are overwhelming. The Officers—both City of Cincinnati employees—were hired, trained, and certified under Ohio's law-enforcement regime, which governs the training peace officers receive throughout their careers. *See* Ohio Rev. Code § 109.803; Ohio Admin. Code § 109:2-18-02. As City of Cincinnati employees, the Officers were supervised by an Ohio department, subject to

Ohio discipline, and bound by a pursuit policy informed by Ohio law and enacted by an Ohio municipality. And the pursuit itself was an Ohio operation, beginning when Meyer fled a lawful stop in Cincinnati.

The conduct Plaintiffs challenge is how the Officers followed CPD's Ohio-compliant pursuit policy. Ohio's interest in answering that question could not be greater. Kentucky, by contrast, lacks a comparable interest. Kentucky did not hire, train, certify, supervise, or discipline these Officers, nor did it write the policy at issue. Kentucky's genuine interest in this case—compensating its injured residents under its own rules of liability—is fully served by applying Kentucky tort law, which the Officers do not contest. But it has no interest in overriding Ohio's judgment about when its own officers may be held liable.

Finally, the district court's application of Kentucky immunity law invites unpredictability. If a police officer's immunity turned on whichever State a fleeing suspect happened to enter, then officers patrolling near a state line would face shifting standards—controlled by the fleeing suspect. An officer who lawfully began a pursuit in Ohio would be judged by Ohio immunity law if the suspect stopped on the Ohio side of the river but by Kentucky immunity law if the suspect crossed into Kentucky (even if the officer did not follow). But immunity should turn on the law of the State

that employs, trains, and supervises law enforcement officers, not on the State that the fleeing suspect enters. For these reasons, this Court should apply Ohio law to determine whether the Officers are immune.

## II.   Under Ohio law, the Officers are entitled to state qualified immunity.

Under Ohio law, the Officers are entitled to state qualified immunity on Plaintiffs' two claims.[4] Ohio's Political Subdivision Tort Liability Act governs liability against the City of Cincinnati and its employees. *See generally* O.R.C. § 2744; *see also, e.g.*, *Williams v. Cincinnati*, No. C-210146, 2021 WL 4978711, at *3 (Ohio Ct. App. Oct. 27, 2021). Under O.R.C. § 2744.03(A)(6), the Officers are immune from liability unless one of the following applies:

(a)   The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b)   The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

---

[4] The Officers argued below that Ohio immunity law governs and entitles them to immunity. (R. 143, Lanter & Thomas Mot. to Dismiss, PageID 3302–11.) The district court did not reach that argument, having resolved the threshold choice-of-law question in Plaintiffs' favor and analyzed immunity under Kentucky law alone. Because that choice-of-law ruling was mistaken, the correct analysis proceeds under Ohio law—and it presents a pure question of law that this Court can resolve on appeal. *See, e.g.*, *Meyers v. City of Cincinnati*, 979 F.2d 1154, 1156 (6th Cir. 1992) ("The application of qualified immunity is a question of law.").

(c)     Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

O.R.C. § 2744.03(A)(6)(a)–(c).

Ohio law sets a high bar for stripping police officers of immunity in pursuit cases. Because police officers have "statutory duties to arrest and detain individuals violating the law," the "burden necessary to deny immunity to those officers is onerous." *Argabrite v. Neer*, 75 N.E. 3d 161, 169 (Ohio 2016). The Ohio Supreme Court explained why that burden is so high:

> We expect law-enforcement officers to protect the public, but that expectation need not mean that an officer must sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further. The danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner.

*Id.* at 166.

Here, there is no dispute that (1) the Officers acted within the scope of their employment; and (2) no civil liability is imposed on the Officers under the Ohio Revised Code. So the immunity analysis turns on whether the

Officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner. Taking the facts in the light most favorable to Plaintiffs, the record confirms that the Officers are immune.

### A. The Officers did not act with malicious purpose or in bad faith.

The Officers did not act with a malicious purpose or in bad faith. Malicious purpose is "the willful and intentional design to injure or harm another, generally seriously, through unlawful or unjustified conduct." *Clements v. Brimfield Twp. Police Dep't*, 92 N.E.3d 37, 41 (Ohio Ct. App. 2017) (citation omitted). And "bad faith" requires "more than bad judgment or negligence; it is conduct that involves a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Anderson v. City of Westlake*, 182 N.E.3d 1225, 1233 (Ohio Ct. App. 2021).

The Officers did not willfully or intentionally injure Plaintiffs. They were executing their law enforcement duties to surveil and apprehend Meyer—a violent criminal who posed a considerable danger to the community. Plaintiffs identify no evidence that the Officers acted with an ulterior motive or had an objective other than to arrest Meyer.

## B. The Officers did not act in a wanton manner.

The Officers did not act wantonly, either. "Wanton misconduct" is the "failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted); *see also Tighe v. Diamond*, 80 N.E. 2d 122, 126 (Ohio 1948) (wanton misconduct is the "entire absence of all care for the safety of others and an indifference to consequences").

Courts break the wanton-misconduct determination into a two-part test. *See generally Matkovich v. Penn Cent. Transp. Co.*, 431 N.E.2d 652, 654 (Ohio 1982). First, they consider whether "there is a failure to exercise any care whatsoever by those who owe a duty of care." *Id.* Second, they consider whether the failure to exercise any care "occurs under circumstances in which there is great probability that harm will result." *Id.* A party can overcome allegations of wanton misconduct by engaging in "minimal efforts to warn." *Id.*

The record forecloses any finding of wanton misconduct. As CPD's IIS Report found, the Officers displayed care for the safety of others throughout the pursuit: they "slowed as they approached stop signs and red lights and exercised due regard for safety when they entered each

intersection at a speed which afforded drivers a reasonable opportunity to avoid a traffic crash." (R. 10–1, Ex. A, Critical Incident Review at PageID 129.) The Officers never made contact with Meyer's vehicle. And the Officers made more than minimal efforts to warn others of the pursuit. (*Id.* (finding that both officers "activated their emergency lights and siren, wore their seatbelt, and activated their [Body Worn Cameras]").)

## C.     The Officers did not act in a reckless manner.

The Officers did not engage in reckless conduct, which is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson*, 983 N.E. 2d at 273; *see also O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008) ("[T]he actor must be conscious that his conduct will in all probability result in injury."). By contrast, an officer's "mere negligence" in the performance of official duties does not "give rise to personal liability." *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 36 (Ohio 1994).

In *Argabrite*, the Ohio Supreme Court explained that "wanton or reckless manner" sets a "rigorous standard[] that will in most circumstances be difficult to establish, especially with respect to a law-

enforcement officer carrying out the statutory duty to arrest and detain a person violating the law." 75 N.E.3d at 164. Police pursuits are inherently risky, but officers cannot be expected to "sit idly by" while a suspect flees—and the "danger of a high-speed chase alone" cannot create a genuine issue of material fact that a police officer acted recklessly. *Id.*

Ohio courts consider a non-exhaustive set of factors to assess whether a police officer acted recklessly during a pursuit. *City of Westlake*, 182 N.E. 3d at 1234. They include: the officer's speed; whether the officer traveled in the correct lane; the time of day, weather, and the officer's familiarity with the road; the road's contour and terrain; traffic conditions; whether the officer made evasive maneuvers; the nature and seriousness of the offense prompting the pursuit; whether a safer alternative existed; whether the officer disregarded the consequences of his actions; whether the officer activated lights and siren; and whether the officer violated any departmental policy. *Id.* On this record, these factors do not establish the conscious disregard of a near-certain risk.

### 1. Meyer's danger justified the Officers' pursuit decisions.

Meyer posed a considerable danger to the community, and the Officers knew it.[5] He was not a misdemeanor offender with a broken tail light; he was trafficking drugs and guns and using violence as he did so, prompting the ATF Task Force's significant allocation of resources to apprehend him. Meyer also had made clear that he intended to use violence against police. Sources reported that he was suicidal, had repeatedly threatened to kill officers, and wanted to die in a shootout rather than return to jail. (R. 10–1, Ex. A, Critical Incident Review at PageID 118.) Pursuing a suspect like Meyer is precisely the kind of "statutory duty to arrest and detain" that Ohio law protects, lest officers be forced to "sit idly by" while a dangerous suspect flees. *Argabrite*, 75 N.E.3d at 164, 166.

### 2. The Officers exercised care throughout the pursuit.

A vehicle pursuit was not the Officers' default course. The ATF Task Force planned to attempt an open-air apprehension, once Meyer left the residence. (R. 58–1, ATF Operational Plan at Page ID 445.) If that proved

---

[5] Meyer's criminal activities presented a societal danger. *United States v. Green*, 532 F.3d 538, 549 (6th Cir. 2008) ("[s]ociety as a whole is the victim when illegal drugs are being distributed in its communities"); *United States v. Thomas*, No. 23-1706, 2024 WL 1672371, at *2 (6th Cir. Apr. 18, 2024) (noting that firearms trafficking "created a danger to the community").

unrealistic and Meyer reached his vehicle, the plan called for ATF agents to perform a vehicle stabilization pin. (*Id.*) Only if a pin could not be executed would CPD officers proceed to the final step—a felony traffic stop. (*Id.*)

Even then, CPD officers considered alternatives to a vehicle pursuit. Sergeant Scalf testified that ATF Task Force members carried stop sticks, but they could not deploy them near Steiner Avenue because they could not yet confirm that Meyer was in the Ford Focus. (R. 138, Scalf Dep., 132:4–17 at PageID 2315.) Lieutenant Lanter, who would initiate the stop, could not deploy them himself, and no other officer could safely get ahead of Meyer's car to do so. (*Id.* at 133:16–17 at PageID 2316; R. 135, Lanter Dep., 136:2–8 at PageID 1487.) Declining to use stop sticks in that urban setting ultimately "reduced risks to bystanders." (R. 140–1, Ex. A, Hughes Report at PageID 2893.)

When Meyer refused to stop, the Officers pursued him, activating their lights and sirens and body-worn cameras, slowing at stop signs and intersections, and exercising "due regard for safety." (R. 10–1, Ex. A, Critical Incident Review at PageID 129.) Their actions "afforded drivers a reasonable opportunity to avoid a traffic crash." (*Id.*)

And the conditions also reduced the risk: the pursuit itself occurred on a summer afternoon, during pandemic lockdowns, with clear visibility.

(R. 136, Occhipinti Dep., 172:4–6 at PageID 2077.) School had not yet resumed, the traffic was light, and there were few pedestrians. (R. 135, Lanter Dep., 104:8–14; 115:2–5; 177:9–11 at PageID 1455; 1466; 1528; *see also* R. 141, Thomas Dep., 208:19–20 at PageID 3121 ("[T]raffic was exceptionally light.").) Likewise, the Officers radioed their locations during the pursuit. (R. 141, Thomas Dep., 207:18–21 at PageID 3120.) This is not the "conscious disregard of or indifference to a known or obvious risk" that recklessness requires. *Anderson*, 983 N.E.2d at 273.

### 3. The Officers' policy infractions do not establish recklessness.

IIS's finding that the Officers exceeded the posted speed limit is not outcome determinative. *Anderson*, 983 N.E.2d at 274. Under Ohio law, a policy violation is one factor among many, and the question remains whether the officer consciously disregarded a risk that would in all probability cause injury. What's more, the Officers' speeding violation occurred on the Sixth Street Viaduct, before the Officers even reached downtown Cincinnati and miles away from the site of Meyer's collision. (R. 10–1, Ex. A, Critical Incident Review at PageID 124.) Then, the Officers "adjusted speeds at intersections, showing due regard for safety, consistent

with policy and constitutional standards." (R. 140–1, Ex. A, Hughes Report at PageID 2891.)

IIS also faulted the Officers for traveling the wrong way down Greenup Street in Covington without receiving proper authorization. (R. 10–1, Ex. A, Critical Incident Review at PageID 129–30.) But that procedural violation—which occurred nearly a mile from Meyer's collision in Newport—did not cause Meyer to crash, nor did it put any motorists at risk. For that matter, Meyer was driving with the flow of traffic on Fifth Street in Newport when he swerved and crashed.

In sum, both of the violations (speed and wrong-way driving) were "tactical responses to Meyer's dangerous driving, reflecting an effort to balance immediate public safety concerns against the risks of pursuit." (R. 140–1, Ex. A, Hughes Report at PageID 2886.) The Officers violated no other pursuit policies. For these reasons, the Officers are entitled to state qualified immunity under Ohio law.

## III. Under Kentucky law, the Officers are entitled to qualified immunity.

Even if the Court applies Kentucky immunity law, the Officers are entitled to immunity. Under Kentucky law, qualified immunity applies to a public officer performing "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation,

decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 831 (Ky. 2021). If the officer makes a prima facie showing that he performed a discretionary function within the scope of his employment, the burden shifts to the plaintiff to establish that the discretionary act "was not performed in good faith." *Sheehy v. Volentine*, 706 S.W.3d 229, 237 (Ky. 2024).

There is no dispute that the Officers acted within the scope of their employment. And the district court correctly determined that the Officers' decision to initiate a pursuit of Meyer was a discretionary act that they performed in good faith. (R. 159, Mem. Op. & Order, PageID 4330.) But the district court also held that the Officers' decision not to terminate that same pursuit—governed by the same policy and requiring the same weighing of factors—was ministerial. Those two conclusions are irreconcilable.

### A. The decision whether to terminate a pursuit is a discretionary act.

The first step in Kentucky's qualified immunity inquiry—and the most important step here—asks whether the act was discretionary or ministerial. "[F]ew acts are ever purely discretionary or purely ministerial," so courts look to the "*dominant* nature of the act" to determine whether the act was

discretionary or ministerial. *Haney v. Monsky*, 311 S.W. 3d 235, 240 (Ky. 2010) (emphasis in original).

Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). They arise when an "act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Upchurch v. Clinton Cnty.*, 330 S.W. 2d 428, 430 (Ky. 1959) (citation omitted). Conversely, a ministerial act "requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero,* 65 S.W. 3d at 522.

To determine whether the act is discretionary or ministerial, Kentucky courts examine the operative policy that governed the officer. *Meinhart*, 627 S.W.3d at 832 (Whether an officer's acts are discretionary "necessarily begins with an examination of the applicable [Standard Operating Procedures] related to pursuits.")

That examination—in conjunction with relevant case law—confirms three things: the district court's conclusion rested on a misreading of both the policy and *Sheehy*; Kentucky courts treat materially identical policies as

discretionary; and CPD's pursuit policy commits the termination decision to officers' judgment.

### 1. The district court misread the operative pursuit policy.

The district court held that the Officers' failure to terminate the pursuit was ministerial—and that the Officers therefore are not entitled to immunity—based on a mistaken interpretation of the operative pursuit policy. According to the district court, "CPD's policy says that officers must terminate their involvement in pursuits when the situation calls for it and the risks of the pursuit outweigh the consequences of the suspect's escape." (R. 159, Mem. Op. & Order, PageID 4331.) But that reading glosses over what the policy actually says the Officers must do. The policy offers this general statement about pursuit termination:

> Officers must terminate their involvement in motor vehicle pursuits whenever the risks to their safety, the safety of innocent bystanders, or the safety of the suspect(s) ***outweigh*** the consequences of the suspect's escape.

(R. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1264 (emphasis added).)

By its terms, the policy directs officers to *weigh* three categories of risk—to themselves, bystanders, and the suspect—against the consequences of letting the suspect get away. The policy does not identify a fact that, once present, compels termination; it requires officers to make a judgment about

44

how those risks compare. The district court's paraphrasing reads that judgment out of the policy.

The district court then compounded its error by stating that the pursuit policy "gives officers no wiggle room to continue a pursuit that is dangerous to the public." (R. 159, Mem. Op. & Order, PageID 4332.) But the policy says no such thing, nor does it mandate officers to terminate a pursuit simply because it poses a danger to the public.

The district court's decision would effectively ban police pursuits altogether, given that police pursuits are inherently dangerous. *See Browder v. Fentress*, No. 2013-CA-002178, 2018 WL 3202975, at *5 n.7 (Ky. Ct. App. June 29, 2018) ("[W]hile often necessary, police pursuits by definition are emergency situations, jeopardizing the safety and lives of those involved, as well as innocent bystanders.") (citation omitted). A policy that required termination of every dangerous pursuit would require termination of *all* pursuits. But the policy says no such thing, and the law does not categorically bar pursuits.

Finally, the district court suggested that the Officers' decision to continue their pursuit was mistaken, given that "Meyer was dangerous and potentially volatile." (R. 159, Mem. Op. & Order, PageID 4334.) That gets it backwards. Meyer's danger and volatility were part of the reason to

apprehend him. But under the district court's reasoning, the more dangerous a suspect, the less law enforcement could do about it. An officer pursuing a wanted tax-fraud felon could continue, but an officer pursuing a wanted gun trafficker could not. That leaves the public less protected from the most dangerous offenders.

## 2. Kentucky treats pursuit policies like CPD's policy as imposing discretionary duties on officers.

The district court's misreading is not just a textual error but also conflicts with Kentucky law. Pursuit policies that require officers to weigh competing factors—just like CPD's policy—are inherently discretionary.

### a. *Meinhart* and *Browning* treat balancing-type pursuit policies as discretionary.

In *Meinhart*, the Kentucky Supreme Court held that an officer's "decision to initiate, continue, or terminate a pursuit" was discretionary and that the officer therefore was entitled to immunity. 627 S.W3d at 834. The court examined the relevant procedures and recognized that an officer must weigh many factors when determining whether to initiate and continue a pursuit—including "the dangerousness of the fleeing suspect and the importance of apprehension; the extent of danger to other persons of pursuit because of weather, time of day, road and traffic conditions; and the availability of alternatives to pursuit." *Id.* Not only that, the officer must

weigh all those factors on the spot. The court remarked: "[i]t is difficult to imagine a situation in which the exercise of significant, independent professional judgment would be more necessary." *Id.*

The pursuit policy in *Meinhart* is substantially similar to CPD's pursuit policy. Both policies require the law enforcement officer to weigh factors and "exercise [] significant, independent professional judgment." *Id.* CPD's pursuit policy involves a "weighing" of subjective factors, including the degree of risk to the public and the nature of the suspected crime. Indeed, it tells officers to "weigh" these factors:

| | |
|---|---|
| • Degree of risk created by pursuit to others, officer, and suspect. | • Condition of police vehicle and suspect's vehicle. |
| • Location where pursuit will take place. | • Any circumstance that could lead to a situation in which the pursuing officer(s) will not be able to maintain control of the police vehicle. |
| • Weather | |
| • Volume, type, speed, and direction of vehicular traffic and direction of pursuit | |
| • Nature/seriousness of suspected crime. | • Type of vehicle being pursued. |
| • Likelihood of successful apprehension. | • Whether the identity of the suspect is known to the point that later apprehension is possible. |

(Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1264–65.)

Many of these are the very factors *Meinhart* identified. 627 S.W.3d at 834. And like the policy in *Meinhart*, CPD's policy leaves the weighing of those factors to the officer's professional judgment. The City's own account of its policy confirms as much. The City's Rule 30(b)(6) representative explained that CPD's pursuit policy commits the pursuit decision to the officer: "based on their training and their experience and the totality of the circumstances in front of them," an officer "should be able to make a decision to continue or discontinue a vehicle pursuit knowing all the parameters that are outlined in the policy and procedure." (R. 139, City Rule 30(b)(6) Dep., 166:17–25 at PageID 2579.)

This Court reached the same conclusion in *Browning v. Edmonson County*, reversing the trial court's denial of qualified immunity to a police officer who engaged in a police pursuit. 18 F.4th 516, 533–35 (6th Cir. 2021) (applying Kentucky law). This Court explained that the governing pursuit policy did not "absolutely mandate when a pursuit must be initiated or when an officer must discontinue pursuit." *Id.* at 533. Instead, "the only requirement with respect to the decision to discontinue the pursuit is that the officer *use his or her discretion* to see if the danger to human life is greater than the need to continue the pursuit." *Id.* at 534 (emphasis added).

That is precisely the judgment CPD's policy required of the Officers here. Under *Browning*, the Officers' termination decision is discretionary, and the Officers are entitled to immunity for their decision.

### b. *Sheehy* does not control.

Rather than follow *Meinhart* and *Browning*, the district court rested its holding on *Sheehy v. Volentine*, 706 S.W.3d 229 (Ky. 2024). It reasoned that CPD's policy is "nearly identical" to the Hardin County pursuit policy at issue in *Sheehy*, which the Kentucky Supreme Court found to impose a ministerial duty to terminate a police pursuit. (R. 159, Mem. Op. & Order, PageID 4330.) But the two policies are not alike, so *Sheehy* does not control.

*First*, the policy in *Sheehy* required deputies to terminate a pursuit if the "circumstances present an extreme safety hazard to the public, the deputy, or the suspect." *Sheehy*, 706 S.W.3d at 235. The Kentucky Supreme Court treated that policy as imposing a ministerial duty. Although the policy contemplated some factual assessment, the officer *had to* terminate a pursuit upon concluding that a specific condition—an "extreme safety hazard"—existed. *Id.* at 243. As important, the officer in *Sheehy* "testified without equivocation that the pursuit presented an extreme safety hazard to the public," and yet he still continued the pursuit. *Id.* at 235.

*Second*, the pursuit policy in *Sheehy* included a bright-line rule for when to terminate a pursuit—which the deputy also violated. Under that policy, a deputy must terminate a pursuit if "no Field Supervisor or higher authority can be contacted to approve the pursuit's continuation." *Id*. That policy "leaves no discretion to the pursuing officer to not contact a higher authority in his chain of command or otherwise to continue a pursuit based on his own judgment," contains "no caveats or exceptions," and imposes a duty that is "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id*. at 241. But the deputy in *Sheehy* continued the pursuit, even though he could not reach his supervisor.

Both provisions of the policy in *Sheehy* share a defining feature: they command termination once a certain condition exists. The Kentucky Supreme Court acknowledged that even a ministerial duty may require the officer to ascertain the facts that trigger the condition: "in practically every situation where a ministerial duty arises there is a threshold determination by the officer to ascertain the underlying facts giving rise to that ministerial duty." *Sheehy*, 706 S.W.3d at 243. So when a deputy observes that an extreme safety hazard has materialized or fails to reach his supervisor, he is

ascertaining a fact. But once this fixed condition exists, the policy dictates the result, depriving the deputy of any discretion.

The CPD pursuit policy is structured differently: it does not name a condition—*e.g.*, "extreme safety hazard"—as an automatic trigger for terminating a pursuit. Instead, it requires officers to weigh multiple factors and decide for themselves whether the risks of pursuit outweigh the consequences of the suspect's escape. So an officer who weighs the risks of pursuit against the dangers of allowing an armed, homicidal fugitive to escape is not ascertaining a fact; they are exercising discretion that the policy confers.

But the district court reached two conclusions that cannot both be true. It held that the Officers' decision to *initiate* the pursuit of Meyer was discretionary. (R. 159 at PageID 4330.) It then held that their decision not to *terminate* that same pursuit was ministerial. (*Id.* at PageID 4331–32.) But both decisions are governed by the same policy, and both require the officer to weigh the same factors—a list the policy directs officers to apply "prior to *and during* a pursuit." (R. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1264–65 (emphasis added).) Nothing in the policy identifies when an officer's discretion gives way to a mandatory command.

### 3. None of the conditions that require pursuit termination applied.

Separate from the general policy on which the district court premised its decision, the CPD pursuit policy identifies four conditions that require the officer to terminate a pursuit. Section 12.535(E)(1), which governs the termination of a pursuit, states:

> Officers will terminate pursuits under any of the following conditions:
>
> a. The pursuit OIC or the primary unit determines the level of danger created by the pursuit outweighs the necessity for immediate apprehension.
>
> b. Establishment of the suspect's identity allowing for apprehension at a later time and there is no longer a need for immediate apprehension.
>
> c. Location of the pursued vehicle is no longer known.
>
> d. The pursued misdemeanor violator crosses the Hamilton County line (Refer to Section F.3.)

(Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1269.) None of those four termination conditions were triggered during the Officers' pursuit of Meyer.

**Subsection (a)**. This subsection operates in two steps. First, the OIC (Sergeant Scalf) or the primary unit (Lieutenant Lanter) must determine that the danger created by the pursuit outweighs the necessity of immediate apprehension. That command is comparative. It does not ask whether a

pursuit is dangerous—every pursuit is—but whether the risks of continuing outweigh the consequences of the suspect's escape.

Then, if the OIC or the primary unit determines that the dangers of the pursuit outweigh the benefits of continuing, the other pursuing officers—*e.g.*, Officer Thomas—must terminate. That determination imposes a ministerial duty on the subordinate officers to terminate their pursuit.

But neither Sergeant Scalf nor Lieutenant Lanter determined that the pursuit should end. Lieutenant Lanter testified that "nothing along that route … made myself or Officer Thomas … think that … the pursuit was too high risk." (R. 135, Lanter Dep., 270:21–23 at PageID 1621; *see also* R. 138, Scalf Dep., 151:1–20 at PageID 2334 (testifying that he believed they were justified in pursuing and arresting Meyer).) Because no such determination was made, no duty to terminate ever arose.

**Subsection (b)**. The Officers did not have an automatic duty to terminate the pursuit upon learning that Meyer was inside the fleeing vehicle. They had to exercise discretion when deciding whether to continue. Under the policy, an officer first must determine whether later apprehension of the suspect is feasible, given what the officer knows about the suspect. Then, the officer must decide whether there remains a "need

for immediate apprehension," given the suspect's criminal history and the nature of his offense. (Doc. 134–1, Bode Dep., Ex. 1, CPD Policy 12.535 at PageID 1269.) So the officer must consider:

- Whether the suspect has tried to evade law enforcement before;

- Whether law enforcement can feasibly apprehend the suspect in the future;

- The seriousness of the suspect's offense;

- The suspect's criminal history and propensity for violence; and

- The risks the suspect poses—to the public, confidential sources, and law enforcement, among others—if he is allowed to escape.

These are not "fixed and designated facts" that dictate a single outcome. *See Meinhart*, 627 S.W.3d at 832 (citation omitted). Deciding whether later apprehension is acceptable for a known, violent fugitive is exactly the kind of judgment call that Kentucky law treats as discretionary. *Id.* at 834 (pursuit decisions are discretionary when the policy "leaves to the officer's individual professional judgment to weigh the law enforcement goals and the specific factors of a situation").

Nor could the Officers reasonably assume that Meyer could be apprehended later. Just one week earlier, CPD and NKYDSF officers had spotted Meyer, initiated a traffic stop, and briefly lost sight of his vehicle—

only to discover, when they finally stopped it, that Meyer was not inside. (R. 58–1, ATF Operational Plan at PageID 443.) Working with members of his criminal enterprise, he had swapped cars during the moments officers lost visual contact. (*Id.*; R. 135, Lanter Dep., 222:2–8 at PageID 1573.) And the ATF Task Force's difficulty in even locating Meyer on August 7 underscored the point: law enforcement began the day surveilling the wrong residence before relocating to Price Hill. (R. 135, Lanter Dep., 250:20–24 at PageID 1601.) Against that backdrop, the Officers had every reason to believe that if Meyer escaped, he would not be easily found again.

**Subsection (c)**. There is no record evidence that the Officers ever lost Meyer's location, once the pursuit began. So this condition was not triggered.

**Subsection (d)**. Meyer was not a misdemeanor violator: the Officers knew he was a felon and saw him placing a rifle case into the back of his car. And Meyer had outstanding warrants for first-degree wanton endangerment and first-degree fleeing and evading police. (R. 58–1, ATF Operational Plan at PageID 442–45.) This condition was not triggered, either.

**B.    Plaintiffs cannot rebut the presumption that the Officers acted in good faith.**

Because their pursuit of Meyer was a discretionary act within the scope of their authority, the Officers have made the prima facie showing that qualified immunity requires. The burden therefore shifts to Plaintiffs to "establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001). Plaintiffs can carry that burden only by showing that (1) the Officers "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive"; or (2) the Officers' conduct was objectively unreasonable. *Id.* They cannot.

Plaintiffs do not contend that the Officers acted with malice or a corrupt motive, and the record would not support such a claim. That leaves objective reasonableness. The undisputed facts confirm that the Officers' decision to pursue Meyer was reasonable. This Court measures the Officers' judgment against their knowledge at the time of the pursuit, not against what hindsight later revealed. *See Yanero*, 65 S.W.3d at 523. So consider what the Officers knew about Meyer when they pursued him:

- Meyer had outstanding warrants for first-degree wanton endangerment and first-degree fleeing and evading. (R. 58–1, ATF Operational Plan at PageID 442–45.)

- Meyer pistol-whipped a victim in July 2020, boasted of murdering a Dayton, Ohio, man, and discharged a gun outside a Newport, Kentucky, home. (R. 58–1, ATF Operational Plan at PageID 443.)

- Meyer told sources that he was terminally ill, had little concern for human life, was suicidal, repeatedly threatened to kill police, and wanted to die in a police shootout rather than return to jail. (R. 10–1, Ex. A, Critical Incident Review at PageID 113, 118.)

- Law enforcement officers saw Meyer place a rifle case into the black Ford Focus that departed from the Steiner Avenue home under surveillance. (*Id.* at PageID 113–14.)

- Meyer was the leader of an interstate drug-and-gun trafficking organization that had pioneered the use of drones to deliver narcotics. (R. 136, Occhipinti Dep., 96:25–97:17 at PageID 2001–02.)

- Meyer routinely assaulted or kidnapped subordinates who failed to remit drug proceeds and had surveilled the mother of a debtor as a threat. (R. 58–1, ATF Operational Plan at PageID 443; R. 135, Lanter Dep., 236:1–12 at PageID 1587.)

- Meyer had evaded capture only a week earlier: officers had stopped the SUV he was driving, but Meyer had swapped vehicles with the help of his organization during the moments officers lost sight of the car. (R. 58–1, ATF Operational Plan at PageID 443; R. 135, Lanter Dep., 222:2–8 at PageID 1573.)

These undisputed facts establish that the Officers confronted a genuinely dangerous suspect whose escape posed grave risks to the community. They acted in good faith by continuing their pursuit.

**IV. The City of Cincinnati is entitled to summary judgment because the Officers are immune.**

This Court can dispose of Plaintiffs' remaining claim against the City—for vicarious liability—if it finds the Officers are immune from liability, regardless of whether Ohio or Kentucky law applies.

Under Ohio law, an employer cannot be held vicariously liable if its employee is not liable for an underlying tort. "If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions." *Comer v. Risko*, 833 N.E.2d 712, 716-17 (Ohio 2005); *see also Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988) ("It is axiomatic that for the doctrine of *respondeat superior* to apply, an employee must be liable for a tort committed in the scope of his employment.").

That black-letter rule applies in Kentucky, too: "An employer cannot be vicariously liable [ ] if its employees commit no tortious acts because 'vicarious liability is not possible without primary liability.'" *Est. of Marr v. City of Glasgow*, No. 25–5662, 2026 WL 735026, at *7 (6th Cir. Mar. 16, 2026) (quoting *Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007)).

The Officers are immune from liability, and they are not liable on the merits. So under either Kentucky or Ohio law, Plaintiffs' claim against the City for vicarious liability fails.

**CONCLUSION**

For these reasons, this Court should reverse the district court's denial of qualified immunity to the Officers and reverse the district court's denial of summary judgment to the City of Cincinnati.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig
Spencer S. Cowan
Taft Stettinius & Hollister LLP
301 E. Fourth Street, Suite 2800
Cincinnati, OH 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
aherzig@taftlaw.com
scowan@taftlaw.com

*Counsel for Defendants-Appellants*
*Timothy Lanter, Brett Thomas, and*
*City of Cincinnati*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,314 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Georgia font.

*/s/ Aaron M. Herzig*

**CERTIFICATE OF SERVICE**

I certify that on July 29, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the ECF system. I also certify that all participants in the case are registered ECF users and that service will be accomplished by the ECF system.

*/s/ Aaron M. Herzig*

## DESIGNATION OF RELEVANT DISTRICT COURT RECORD

| Description of Entry | Record No. | PageID # |
|---|---|---|
| | | |
| Notice of Removal | R. 1 | 1-5 |
| Complaint and Jury Demand | R. 1-1 | 10-38 |
| Declaration of Mark Manning | R. 10-1 | 110-133 |
| Defendants Timothy Lanter, Brett Thomas, and Donald Scalf's Petition for Westfall Act Certification | R. 34 | 245-263 |
| ATF Operational Plan | R. 58-1 | 442-452 |
| Memorandum Opinion and Order | R. 64 | 464-508 |
| United States' Motion to Dismiss | R. 96 | 790-806 |
| Plaintiffs' Motion to Drop the United States of America as a Party and to Stay Briefing on the Pending Motion to Dismiss | R. 98 | 832-836 |
| Memorandum Order | R. 103 | 851-857 |
| Defendants' Notice of Manual Filing of Videos | R. 133 | 980-982 |
| Deposition of CPD Officer Mark Bode | R. 134 | 983-1262 |
| Policy 12.535 – Emergency Operation of Police Vehicles and Pursuit Driving | R. 134-1 | 1263-1275 |
| Deposition of Lieutenant Timothy Lanter | R. 135 | 1352-1709 |
| Deposition of Frank Occhipinti | R. 136 | 1906-2138 |
| Deposition of Sergeant Donald Scalf | R. 138 | 2184-2387 |
| Deposition of Chief Teresa Theetge | R. 139 | 2414-2674 |

| | | |
|---|---|---|
| Declaration of Scott Hughes | R. 140-1 | 2880-2913 |
| Deposition of Officer Brett Thomas | R. 141 | 2914-3198 |
| Defendants Timothy Lanter and Brett Thomas's Motion for Summary Judgment | R. 143 | 3287-3320 |
| Mason Meyer Indictment | R. 143-1 | 3321-3324 |
| Commonwealth's Offer on a Plea of Guilty | R. 143-2 | 3325-3327 |
| Defendant The City of Cincinnati's Motion for Summary Judgment | R. 144 | 3378-3398 |
| Memorandum Opinion and Order | R. 159 | 4312-4338 |